Okay, our next argument of the morning is in Appeal Number 25-1293, Valley View Farms v. BOS Dairy and others. Yeah, Mr. Dowell, nice to see you. Good morning, Your Honor. Hold on just one second. Okay, whenever you're ready. May it please the Court. I believe we have three points on our side that we need to convince the Court of in order to prevail. And admittedly, if we lose on any one of them, we're done. The first is that the harvester's opinions of the tons per acre that they allege that they yielded, was that expert opinion or lay opinion? Second, if it was expert opinion, was it an abuse of discretion to have that admitted before a jury? And three, given that it was admitted before the jury, was that sufficiently prejudicial to warrant a new trial? And I believe on each of these, although we disagree in the briefing, the case law is clear as to what the standards are for each. Mr. Dowell, your argument seems to have shifted a bit from your opening brief to your reply brief. So I want to make sure I understand what your argument on the expert testimony is. Are you arguing that the opinions here about what the acreage would yield are expert opinions and that's what they gave here? Or are you also challenging opinions on the tons per acre of corn silage to the extent that they individually harvested them? Do you understand the distinction? I believe so. Each of the harvesters testified to how much they individually did. And is it your argument that testimony about what they individually did is expert testimony? Absolutely. Yes, absolutely. And the reason being that it's not something either of us could do. Well, first of all, we couldn't drive a harvester. I suspect no one is here that could. And even if you could, you couldn't tell how much tons per acre you were getting based on the speed, based on looking at the corn, based on the weather or whatever conditions. I liken it to mowing a yard. I mean, we all know that we have to mow a little slower when the grass is higher, but we still couldn't say, well, that's five yards of grass or produce that number. Each of the witnesses was asked in classic textbook law school expert testimony, you know, what's your background? How many thousands of acres have you done before? What did you observe that day? Reaching the ultimate conclusion. And we all learned, you know, all trial lawyers learn that technique. And that is what was done with each one of them. I also confirmed, you know, when my goose was cooked, with each one, is that specialized knowledge? I couldn't do that, right? Each one of them admitted that. They admitted to their expertise. Although we can't let the witnesses' answer on specialized knowledge dictate whether or not it's really specialized knowledge. I did get the magic word, but I first said, I couldn't do that, correct? No one else could do what you do. And they each admitted it. Isn't that also true of lay witnesses who have particularized knowledge by virtue of their position? They can often do things that other people in the courtroom can't do. Then I think that is when we—then it gets to where it's expert opinion rather than a lay opinion. No, that's a definition of a lay witness. And I'm sorry, Your Honor? A lay witness can also have particularized knowledge by virtue of their position. In certain circumstances, but not where the special expertise moves over into expert witnesses. And there's a very narrow line of cases. For example, business owners testifying about their profits and those kind of things. But lay opinion is limited to people's—you know, someone's drunkenness or their emotional state or the speed of a car, something that we all can do in general. And this— What do you think about—I think the line drawing here is hard. It's what makes the appeal interesting. And what do you think about testimony where you go to somebody that's worked on cars for 30 years and they've replaced tens of thousands of brakes and there's a personal injury because of a brake failure and you call the mechanic in and you say, how many—you know, I know the car owner declined to get the brakes or the rotors replaced. How many miles do you think those brakes had left in them? Expert—I believe that's expert testimony without question. I couldn't answer that question. No, no, no, I know. Well, no, but I think that goes to Judge Jackson-Kimey's point that maybe you couldn't or I couldn't or she couldn't. But the folks that work on brakes for 30 or 45 years possibly could that way. I believe they could and— That's not just based upon—that is specialized knowledge in your view? I believe it is, yes, Your Honor. What about a treating physician? We have said—what about a treating physician? We have said that when a patient goes to a treating physician and in the course of that treatment the doctor, the physician, gives an opinion about what the cause of the injury was. As long as it's in the course of that treatment that that's lay testimony and that's permissible. How would you distinguish that from the harvesters? I would distinguish that because these harvesters were specifically asked what their experience was as a buildup to providing the opinion. I believe with the treating physician if each one could do it that conclusion is not based on their— It's not— Certainly, I couldn't do that. You couldn't do that. It's certainly based on their specialized personal knowledge because they're doctors and that's what they do. They treat these patients and sometimes when they're treating they give an opinion or come up with an opinion about the cause. Well, to fall under Rule 701 their testimony must not be based on specialized knowledge. So if there's special exceptions— We have consistently said in the case law that that testimony is okay as lay opinion testimony. So I'm not sure how you would differentiate. Well, then I would suggest then that if the courts have carved out exceptions in certain instances for specialized knowledge harvesters of corn is not the next area to go to. It's not— You're probably never going to see another case like this. You will see others where there's other types of experts and based on physicians or mechanics I can see that coming up a lot. I can't see throwing away the distinction between Rule 701 and 702 because you have created exceptions in other areas. Would you— Oh, go ahead. Go ahead. I wasn't asking a question. Oh, okay. I got another one for you if you don't mind. All right. And that is I have an impression of your case that you're going to strongly disagree with but it's the benefit of your reaction that I'd like to hear. Okay. And that is you spend a lot of time criticizing the three harvesters. Okay. And you criticize them in part by saying this was really, really damaging to my case. Okay. But your case didn't seem all that strong to me to begin with. Okay. In that I totally understand the theory of it and the concern that animated the case and completely willing to believe your client is convinced to an absolute certainty that there's been diversion of silage. Okay. But you didn't have much direct evidence of that at all. In other words, you didn't have evidence that the scale tickets were fabricated, the scale guy was paid off. We got photographs of, you know, three or four truckloads going who knows where but they weren't going to the, you know, the weigh station and all that. So it didn't, all that is is a way of saying any error here may well have been harmless. Your Honor, admittedly we had zero direct evidence of the diversion of the silage. What we had, our case was entirely built on our expert testimony. We had the foremost expert. First of all, we had the measurement made beforehand. Yeah, that fellow that went out into the field. What's his name? Corning? Mr. Corning, yes.  That guy that went out into the field did a pretty limited sample though, at least as I read the record. Well, we had Dr. Lauer who came in and said that's the standard for providing measurements and providing an estimate of the tons per acre. The system that he used, take an eight and a half foot row of corn. How did Corning's work go to the issue of conversion versus the threshold question that you seem to be at which is there's a difference between the appraisal we got and the yield. So this ties back to Judge Scudder's question about where's the evidence of conversion and you've mentioned Corning but I don't see how that's circumstantial evidence of conversion. It's evidence of how much corn was in that field compared to what was reported. But they're not disputing that there's a difference between the estimate and the yield. And I believe with our additional expert testimony as to what the yield should have been based on the weather, based on pictures of corn we had from that time, based on the chemicals that were used and based on the type of corn that was planted that the number should have been higher and it could have only been, it didn't disappear, it could have only if the measure... But did Corning help you make that particular point if it could only have been theft at that point? I believe so. It had to go somewhere. And the measurement and reporting of the corn was totally in the dairy's power. It was if someone gave you and I a bag of cash and I took it in the other room and I came back and I said here's your half, it's five dollars. How would we verify that? And if we had all these other inputs on what that amount should have been that are inconsistent, I could have only taken the half that I should have provided to you. And I believe that was our case. And admittedly, there's no direct evidence. We didn't see someone driving off with the corn that we can name or get a picture of. But many cases are handled that way. And based on expert testimony. And we had the foremost expert to come in and say these numbers, something smells here. And here's an included testimony on how they could have done it. They could have a finger on the scale. They could not dry the corn all the way when it's measured. Any number of ways. And a jury is entitled to rely on that. And that's where the determination should be made. Not at the gatekeeping role at the beginning where the other side was allowed to present contrary evidence to the tons per acre number that only we had provided and we had given in advance with expert reports and disclosures and depositions. Okay, Mr. Dahl. We're going to give you that one minute rebuttal. Let's hear in the meantime from Mr. Shelman. Thank you. You're welcome. Thank you. My name is Don Shelman. I'm from Rustler, Indiana. Second time I've been in front of you and probably my last. I appreciate this. I represent Boston and hermit area in this matter. The court's ruling on this at the time of trial was that the chopper operators could testify on what they personally experienced with their harvesting. But they couldn't give a total number of tons per acre that they actually chopped. And what they in fact testified to was what they personally observed when they were chopping, that is running the harvester through the fields. What they personally experienced in regards to the height of the corn, whether it was their testimony, four to eight foot, based upon 12 foot of corn where you get a lot more silage. They also testified about the speed that they were able to go their choppers just through the fields between four to five and a half miles per hour versus three when it's real thick. They also testified about the soil type, testified about the lay of the land with the valleys and the hills where you don't produce as well. And also testified about the portions of the field that Valley View never even planted that goes into the calculation of your average for the total silage. None of their testimony was based upon what the 701 says, scientific, technical or specialized knowledge. They had no calculations. They didn't do anything upon any type of science, any book, any publication, any theory. It may not be scientific, but certainly there is some specialized knowledge required here to talk about the yield. If you're not out there in the fields and you haven't done that before, I certainly couldn't go out there and talk about the yield.  And thus why testimony was, have you done this before? What have you experienced? How many times have you done that? Exactly. And I think the mowing example that everyone can understand, including law clerks over here, you mow. Is the grass tall or is it short? Is it thick or is it sparse? Are you going to have to dump your bag three times or five times? Can you do it on the first time? No. But after you mowed your 15th yard and doing this, can you get a sense of where you are? That's exactly what the chopper operator said. It wasn't technical. It wasn't specific. The part of it, I think a lot of what you're saying makes total sense. I mean, they can say it was four feet tall and it was sandy and it seemed a little thin and all that. The part that gets a little tricky about this is when you say, well, what did you think the yield was going to be per acre? And they say 18, whatever, 18, 17, 19, all that. Okay. It's the kind of step from the observations that I think you're 100% right about. They can describe what they saw and what they experienced and they could even compare it to last year. How was last year? Corn was taller, didn't seem as dry, etc. I think all that's fine. That's just based upon what they experienced, what they observed. But help us on that next step. And so the amount. Yeah, exactly. It's sort of like, you know, the grass clippings. You sort of know how much you're going to get. They know what it is because, you know, the interesting thing is is that they know that because they say, I've done it. I've done, one guy did it for a short amount of time, but a lot of them have been doing it for a while. 20 years. Yeah. Yeah. 100,000 acres. You know, they could sense what they're getting because the one thing is is that they get paid on the total amount. Just like Valley View got paid on the total amount. The truckers got paid on the total amount. They know what they're doing. They could sense that when they're doing that. And that's what that's based upon. But the true test was the certified scales that it was taken over. Because everyone who testified says here's how you determine a yield on any crop grown in the United States or anywhere. Is that you put it over the scales. And that's the same thing with silage. And that was exactly what was done over certified scales in this. And so is it your position that when the courts and it's a pre-trial ruling says they can testify but they can't testify about the total. The total was relating solely to the amount on the scales. And so that's why in your view there's daylight between the chopper's testimony about the average they observed was very different from the testimony about the total. Correct. Because you know the total was like 7,454 tons. You know. And they couldn't testify to that total. And they were never asked. And there was no testimony to that point at all. There was none. And I think you know what these choppers testified to was exactly what the case law lays out based on their perception. Based upon you know what they were the inferences they got from the sense that they personally observed based upon you know the So do you see it as testimony akin to picking up on Judge Saney's questions like where you ask a very experienced nurse you know how much blood do you think the patient lost you know when you started treating the patient? Is that specialized knowledge or is that you know they say well I didn't measure it we didn't we weren't we weren't collecting it in a bucket or anything but you know I've done this for 30 years and this person came in with a bad stabbing wound and I think they lost X. Based upon what they personally observed they can say yeah it looked to me like it was you know three cupfuls or you know whatever you know it's not an exact total just like they didn't do it it was their perception about what they saw based upon you know how they actually harvested the crop that's what they were given it was their it was all based upon their perception they didn't do a calculation they didn't make any type of well is it fair to say they didn't do a calculation when they did calculate the average per acre they gave an estimate of what they felt that the harvest was going to be and by the way the estimate they gave was consistent with every other testimony that there was about the actual harvest doing and also verified by the certified scales they're all consistent with one another did you did you all put in I trust you did or I took it from the brief did you all put in the tickets from the elevator company from the scales yes we did and the calculation of because this is a contract case and the contract case by the way in the contract when the Valley View signed it they gave their projection of what they thought the yield was going to be and it was 18 tons exactly right in the level of what it was based upon they've done this had a contract with them for over 20 years on the same fields there was evidence about what these same fields yielded in the past all consistent with what this was this year this was the first time in 20 years there was evidence evidence of what the yields were in the past that was introduced into the trial record yes now was there evidence of prior appraisals I mean because it begs the question why Mr. Corning's appraisal was so high there was a other testimony about an appraisal by a crop insurance adjuster who did it on that land in the past and who did it on land right around this in that same year and that was 16-21 tons and that was done by Todd DeWeese other interesting thing about Mr. Corning that you referenced if you look in there Mr. Corning didn't do this on his basis of what he did for the insurance company this was a favor to Mrs. Mercer because she called and asked him to do it it was done a month and a half before the crop was ready to be harvested he didn't take the required number of  that the standard is in the adjusting of corn you have 17 required samples on the east side of I-65 and 15 of 34 required samples on the west side he took 48% of what he was supposed to acknowledged that he didn't go in all the  didn't know the boundaries of the  acknowledged that he didn't he actually acknowledged that he didn't adjust it to 34% moisture which is what the contract requires it to be because if the silage has 30% moisture off his number no he never considered it in fact it was just his guesstimation done a month and a half prior to harvest and that's the basis of the litigation we filed a motion for summary judgment too and by the way these chopper operators filed affidavits and the  were exactly what they testified to at trial and that was done more than a year before the trial Valley View knew exactly what they were going to say because they said it in their affidavits this wasn't anything that came out of nowhere they knew exactly what they were going to say and if I may the standard that you have even if you find the judge committed error and allowed us to do it the standard is rather high that has to have a substantial influence over the  and the testimony that we  from the other witnesses that we had test testify about how much harvest it was and more importantly it was consistent with the certified scale tickets that showed the exact amount of something we think we got from the  witnesses that showed the exact   something we think we got from the other witnesses that showed the exact amount of something we think we got from the other witnesses that  the      think we got from the other      amount of something we  we got from the other                           witnesses    exact     think we got from the other witnesses that showed the exact amount of something we think we got from the other witnesses that  the exact   something we think we got from the other witnesses that showed the exact amount  something  think    we got from  other witnesses that showed the exact amount of something we think we got from the other witnesses that showed the exact amount of something we                                                         something